IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE ART INSTITUTE OF PHILADELPHIA LLC, *et al.*,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 18-11535 (LSS)<br><br>Jointly Administered |
| GEORGE L. MILLER, Chapter 7 Trustee,<br><br>Plaintiff,<br>v.<br><br>TODD S. NELSON, JOHN R. MCKERNAN, SAMUEL C. COWLEY, EDWARD WEST MARK A. MCEACHEN, FRANK JALUFKA, J. DEVITT KRAMER, MARK NOVAD, JOHN DANIELSON, AND MICK BEEKHUIZEN,<br><br>Defendants. | <br><br>JURY TRIAL DEMANDED<br><br>Adversary Proceeding No. _____ (LSS) |

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Education Centers, Inc. (6160); Argosy Education Group, Inc. (5674); Argosy University of California LLC (1273); Brown Mackie College - Tucson, Inc. (4601); Education Finance III LLC (2533); Education Management LLC (6022); Education Management II LLC (2661); Education Management Corporation (9571); Education Management Holdings II LLC (2529); Higher Education Services II LLC (3436); Miami International University of Art & Design, Inc. (1065); South Education – Texas LLC (2573); South University of Florida, Inc. (9226); South University of Michigan, LLC (6655); South University of North Carolina LLC (9113); South University of Ohio LLC (9944); South University of Virginia, Inc. (9263); South University, LLC (7090); Stautzenberger College Education Corporation (4675); TAIC-San Diego, Inc. (1894); TAIC-San Francisco, Inc. (9487); The Art Institutes International Minnesota, Inc. (6999); The Art Institute of Atlanta, LLC (1597); The Art Institute of Austin, Inc. (3626); The Art Institute of California-Hollywood, Inc. (3289); The Art Institute of California-Inland Empire, Inc. (6775); The Art Institute of California - Los Angeles, Inc. (4215); The Art Institute of California-Orange County, Inc. (6608); The Art Institute of California-Sacramento, Inc. (6212); The Art Institute of Charleston, Inc. (6048); The Art Institute of Charlotte, LLC (4912); The Art Institute of Colorado, Inc. (3062); The Art Institute of Dallas, Inc. (9012); The Art Institute of Fort Lauderdale, Inc. (0255); The Art Institute of Houston, Inc. (9015); The Art Institute of Indianapolis, LLC (6913); The Art Institute of Las Vegas, Inc. (6362); The Art Institute of Michigan, Inc. (8614); The Art Institute of Philadelphia LLC (7396); The Art Institute of Pittsburgh LLC (7441); The Art Institute of Portland, Inc. (2215); The Art Institute of Raleigh-Durham, Inc. (8031); The Art Institute of St. Louis, Inc. (9555); The Art Institute of San Antonio, Inc. (4394); The Art Institute of Seattle, Inc. (9614); The Art Institute of Tampa, Inc. (6822); The Art Institute of Tennessee-Nashville, Inc. (5359); The Art Institute of Virginia Beach LLC (2784); The Art Institute of Washington, Inc. (7043); The Art Institutes International II LLC (9270); The Illinois Institute of Art at Schaumburg, Inc. (3502); The Illinois Institute of Art, Inc. (3500); The Institute of Post-Secondary Education, Inc. (0283); The New England Institute of Art, LLC (7798); The University of Sarasota, Inc. (5558);Western State University of Southern California (3875).

**COMPLAINT**

I.    **INTRODUCTION**

1.    Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Debtors Education Management Corporation ("EDMC") and subsidiaries (collectively, the "Company" or the "EDMC Companies" or the "Debtors"), by and through his counsel, brings this action to recover more than $200 million in compensatory damages, along with punitive damages, arising out of, among other things, Defendants' prepetition breaches of fiduciary duty, fraud, civil conspiracy, corporate waste, unjust enrichment and preferential and fraudulent transfers made by the Debtors to certain Defendants.

2.    This adversary proceeding arises from the demise of the EDMC Companies, a conglomerate of one of the largest for-profit providers of secondary education in the world, whose exponential growth was fueled by private equity investors that implemented illegal recruiting and compensation schemes to pump up growth and tap federal student loan funds.

3.    In breach of their fiduciary duties to the Company, the Defendants caused the EDMC Companies to operate in violation of the federal laws and regulations applicable to the Debtors' ownership and management of post-secondary for-profit learning institutions – i.e., Title IV ("Title IV") of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070, *et seq*. (the "HEA") and in violation of applicable state laws and regulations.  Defendants conspired among themselves and the more than 100 EDMC operating subsidiaries to engage in this illegal behavior, including those operating subsidiaries identified as Debtors herein, resulting in fines and penalties exceeding $95 million, numerous consent decrees and the loss of more than $100

million of outstanding tuition obligations by way of loan forgiveness, the combination of which crippled the Debtors and ultimately resulted in their demise.

4.     Adding insult to injury, certain of the Defendants abused their positions of trust, lined their pockets and looted the EDMC Companies of more than $20 million while the EDMC Companies sold off parts of their business for pennies on the dollar and spiraled out of existence.

## II.    <u>JURISDICTION AND VENUE</u>

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 (the Bankruptcy Code), or in or related to cases under Title 11.

6.     The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does <u>not</u> consent to the entry of final judgment or adjudication by a bankruptcy judge.

7.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III.    <u>PARTIES</u>

### <u>The Plaintiff</u>

8.     Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the Debtors.

9.     On June 29, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 7 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware – with the cases being jointly administered under the caption, *In re Art Institute of Philadelphia, LLC*, *et al.*, U.S.B.C. D. Del., Case No. 18-11535 (LSS) (collectively, the "Bankruptcy Cases").

10.     The corporate structure of the EDMC Companies includes (a) ultimate parent Education Management Corporation ("EDMC"), a Pennsylvania Corporation, (b) four

intermediate holding companies (collectively, the "Delaware Holding Companies"), i.e., Education Management Holdings, LLC, Education Management LLC, Education Management Holdings II, LLC, and Education Management II LLC, each of which is a Delaware limited liability company for which EDMC served as the sole and managing member, and (c) numerous for-profit learning institutions that were wholly-owned subsidiaries of the Delaware Holding Companies. A chart of the Debtors' corporate structure at times material hereto is attached to this Complaint as Exhibit A.

11.     At its peak in 2011, the Debtors had approximately 160,000 students, and operated four different education systems (The Art Institutes, Argosy University, Brown Mackie Colleges and South University) and an ABA accredited law school, Western State University College of Law. Many of the individual institutions are Debtors in the Bankruptcy Cases, as identified herein.

## The Defendants

12.     Defendant Todd S. Nelson ("Nelson") is an individual residing at 3250 E. Tere St, Phoenix, AZ 85044. Prior to joining the Debtors, Nelson was an executive with the University of Phoenix, a for-profit education institution sanctioned for federal law violations during his tenure substantially similar to those which plagued the Debtors and caused their demise.

13.     Nelson served as (a) Chief Executive Officer and a member of the boards of EDMC and each of the Delaware Holding Companies (collectively, the "EDMC Boards") from February 2007 to July 2012, and (b) as the Chairman of the EDMC Boards from July 2012 to November 2013. At times material hereto, Nelson played an instrumental role in putting into place, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors.

4

14.    Defendant John R. McKernan, Jr. ("McKernan") is an individual residing at 337 Foreside Rd., Falmouth, ME 04105.   McKernan was a member of the EDMC Boards from 1999 until April 2015, serving as Chairman from 2006 to 2012.  Additionally, McKernan served as the Chief Executive Officer of EDMC and the Delaware Holding Companies from 2003 to February 2007.   At times material hereto, McKernan played an instrumental role in putting into place, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors.

15.    Defendant Samuel C. Cowley ("Cowley") is an individual residing at 2136 E. Goldenrod St, Phoenix, AZ 85048.  Cowley served on the EDMC Boards from 2009 to 2014 and was a member of the Audit Committee.  At times material hereto, Cowley played an instrumental role in supervising, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors.

16.    Defendant Edward West ("West") is an individual residing at 246 Pink House Rd, Sewickley Heights, PA 15143.  West was EDMC's and the Delaware Holding Companies' CEO and a member of the EDMC Boards from July 2012 to August 2015, and their Chief Financial Officer from 2006-2012.  At times material hereto, West played an instrumental role in putting into place, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors.

17.    Defendant Mark A. McEachen ("McEachen") is an individual residing at 6 Marquette Way, Trabuco Canyon, CA 92679.  McEachen was CEO of EDMC and the Delaware Holding Companies from September 2015 until December 2017.  McEachen also served as Chairman of the EDMC Boards from April 2015 through December 2017.  At times material hereto, McEachen continued the unlawful activities hereinafter described which caused damage

5

to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company prior to McEachen's arrival.

18.      Defendant Frank Jalufka ("Jalufka") is an individual residing at 22112 Verbana Parkway, Spicewood, TX 78669-6305.   Jalufka was CEO of EDMC and President of each Debtor from December 2017 until the Petition Date, and he signed each of the Petitions.  Prior to December 2017, Jalufka was Chief Financial Officer of EDMC and the Delaware Holding Companies from January 2016 through December 2017.   At times material hereto, Jalufka continued the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company prior to Jalufka's arrival.

19.      Defendant J. Devitt Kramer ("Kramer") is an individual residing at 151 Laurel Oak Drive, Sewickley, PA 15143.  Kramer served in the following positions for EDMC and the Delaware Holding Companies: (a) Vice President, Senior Counsel and Assistant Secretary from May 2004 through June 2005; (b) Vice President Corporate Compliance from July 2005 through June 2006; and (c) Senior Vice President, General Counsel and Secretary from July 2006 through December 2017.  At times material hereto, Kramer played an instrumental role in putting into place, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against

6

those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company.

20.    Defendant Mark Novad ("Novad") is an individual residing at 208 White Oak Drive, Slippery Rock, PA 16057.  Novad served in the following positions for EDMC and the Delaware Holding Companies: (a) Vice President of Human Resources from 2008 through December 2011; (b) Senior Vice President of Human Resources from December 2011 through August 2015; and (c) Office of the Chairman and Senior Vice President of Human Resources. At times material hereto, Novad played an instrumental role in putting into place, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company.

21.    Defendant John M. Danielson ("Danielson") is an individual residing at 4033 Mansion Dr NW, Washington, DC 20007.  Danielson was a member of the EDMC Boards from April 2015 through June 2018.  At times material hereto, Danielson played an instrumental role in supervising, approving and continuing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company.

22.    Defendant Mick Beekhuizen ("Beekhuizen") is an individual residing at 777 Avenue of the Americas, Apt. 25c, New York, NY 10001.  Beekhuizen served as a member of

7

the EDMC Boards from October 2009 through April 2013 and as Executive Vice President and Chief Financial Officer of EDMC and the Delaware Holding Companies from April 2013 through March 2016.    At times material hereto, Beekhuizen played an instrumental role in supervising, approving and directing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company.

## IV.    FACTS

### EDMC is Founded in 1962 and Expands Over the Next Four Decades

23.    EDMC was founded in 1962.  It acquired the Art Institute of Pittsburgh in or around 1970 and launched additional schools in the Art Institutes system.

24.    In November 1996, after expanding the Art Institutes chain and growing enrollment into the thousands, EDMC and certain shareholders sold shares of EDMC's common stock to the public in an initial public offering raising $45 million.

25.    In 2001, EDMC purchased rival for-profit education group Argosy Education Group, Inc. ("Argosy"), for $78 million.  At the time, EDMC operated 22 Art Institutes and two other schools.  Argosy operated seven educational institutions across the country with more than 5000 students.

26.    In April 2003, EDMC acquired South University ("South").

27.    In June 2003, EDMC acquired American Education Centers ("AEC") (and its 18 for-profit colleges) for $116 million.  The AEC schools were later re-branded as Brown-Mackie

8

College ("Brown-Mackie").  With this acquisition, enrollment at EDMC-owned schools topped 50,000.

28.　　In September 2003, Defendant McKernan became EDMC's CEO.

**A.  The 50/50 Rule is Repealed and the Private Equity Investors Take Over EDMC**

29.　　In 2006, Congress deregulated online education by removing the "50 Percent Rule" or "50/50 Rule."  The 50 Percent Rule had required institutions of higher education to enroll more than half their students in campus-based programs (as opposed to online programs) to obtain full access to federal funding of student loans.

30.　　The removal of the 50/50 Rule led to explosive growth at for-profit educational institutions providing primarily online course offerings.

31.　　Wall Street investment bankers quickly seized upon the lucrative opportunity posed by deregulation -- investing in for-profit educational institutions and implementing enrollment strategies to achieve hypergrowth and capture student aid funds.

32.　　In 2006, EDMC was acquired in a $3.4 billion highly leveraged buyout (the "2006 LBO") by a consortium of private equity investors, including Goldman Sachs Capital Partners, Providence Equity Partners, and Leeds Equity Partners (collectively the "Private Equity Investors").

33.　　To service the substantial debt incurred in the 2006 LBO of approximately $2 billion and seek to drive out-sized returns from their investments, the Private Equity Investors changed the culture of EDMC to pursue aggressive growth strategies that undermined academic quality and opportunity and were driven by unlawful recruiting and enrollment practices.

34.　　A ten-fold increase in online student enrollment followed in the next five years driven by EDMC's oversized recruiter team.  By 2010, the Company employed one recruiter for

every 28 students, while each career counselor was responsible for 493 students and each student services staffer was responsible for 133 students.

### B. The Private Equity Investors Recruit a For-Profit Education Veteran with a Checkered Past

35. Shortly after the Private Equity Investors took over EDMC, they moved quickly to institute leadership that would focus on unrestrained growth in enrollment.

36. In January 2007, Defendant Nelson, who had recently run the for-profit University of Phoenix ("Phoenix"), became EDMC's CEO. Nelson's departure from Phoenix followed a settlement with the Department of Education in which a fine was paid for unlawful recruiting practices.

37. According to the Huffington Post's 2011 article titled "With Goldman's Foray Into Higher Education, A Predatory Pursuit of Students and Revenues," by early 2007, "EDMC was already a substantially changed company compared to its pre-buyout days." Except for McKernan, an entirely new board of directors was in place, including directors put in place by the Private Equity Investors.

38. The new focus on online enrollment, with its easy access to plentiful federal student loan funds, fueled explosive growth. An online student enrollment of 4,000 increased tenfold in the following five years driven by aggressive recruiting of unqualified students.

39. When Nelson joined EDMC as its CEO in January 2007, EDMC had an enrollment of 82,000 students. By 2011, enrollment had doubled to 160,000 students, making the Company the second largest for-profit higher education company in the country.

40. During this period, annual revenue nearly tripled to $2.8 billion (nearly 90 percent of which came from the federal student aid programs).

41.     Turning a blind eye to the then-record $9.8 million settlement with the Department of Education during Nelson's tenure at Phoenix as a result of unlawful enrollment tactics, the Company hired at least ten former University of Phoenix officials in top management positions following the 2006 LBO.

42.     In a Program Review Report made public in 2004, the Department of Education described the University of Phoenix as a predatory machine, with a sales force that was singularly focused on maximizing enrollment.

43.     Among the important findings in the University of Phoenix report were the consistent accounts from both recruiters and enrollment managers about how employees received raises.  Central to the salary calculations was a performance chart known as "the matrix," which clearly laid out how many students were needed to attain certain salary brackets.

44.     After resigning from his position at Phoenix, Nelson reemerged to take the reins at EDMC, bringing to the EDMC Companies the same illegal playbook, the matrix and many of the same players from Phoenix.

45.     In addition to Nelson, other individuals who had left their employment with the University of Phoenix following its settlement with the Department of Education and were subsequently employed by EDMC in management-level positions included: EDMC's Senior Vice President and Chief Financial Officer, Robert A. Carroll; EDMC's Senior Vice President John Kline, the former Senior Vice President of Operations and Finance for the University of Phoenix Online from August 2002 - February 2006 and its Chief Administration Officer from February 2006 - October 2007; EDMC's Chief Accounting Officer, Craig Swenson, the former Provost and Senior Vice President for Academic Affairs for University of Phoenix and Senior Regional Vice President and Campus Director for University of Phoenix; Ken Boutelle EDMC's

11

former Vice President of Admissions for EDMC's Online Higher Education Division and former Director of Enrollment at the University of Phoenix; Anthony F. Digiovanni, EDMC's Senior Vice President- Marketing and Admissions; Sam Yaghoubi, David Preece, Phil Clark, Sean St. Clair, Jamie Wellnitz and Mary Dyer-St. Clair.

46.     To carry out their scheme for exponential growth and implement their conspiracy with the EDMC operating entities, Nelson and his colleagues, with the approval of McKernan and the remainder of the EDMC Boards, set their sights on the Company's online-only offerings, which had only about 4,000 students at the time of the 2006 LBO.

47.     At the time of the 2006 LBO, EDMC had employed about 550 recruiters.  Under Nelson's leadership, the number of Assistant Directors of Admissions ("ADAs"), the euphemism attributed to the boiler room of recruiters, skyrocketed.

48.     In 2010, with 158,300 students, EDMC had employed 5,669 recruiters, 321 career service employees, and 1,187 student service employees. Accordingly, each career counselor was responsible for 493 students and each student services staffer was responsible for 133 students, yet the Company employed one recruiter for every 28 students.

49.     The ADAs were encouraged and incentivized by EDMC management to dramatically increase student enrollment in violation of the requirements of accrediting agencies, as set forth, *infra*, by systemic abusive, deceptive, fraudulent and unlawful recruiting practices, for which the ADAs were illegally rewarded with direct or indirect commission payments for each student enrolled.

50.     EDMC's focus under Nelson and his management team was recruiting as many students as possible, regardless of their merits or qualifications, as was evident from the training materials used to train ADAs.

51.    For example, in the materials for the 2008 New Directors of Admissions ("DOAs"), there was a presentation setting forth guidance for Directors of Admissions to use in interviews of new ADAs.  In a slide presentation entitled "Supporting Productivity:  Reward & Consequence," DOAs were instructed to set expectations for ADAs in their initial interviews by telling them that "This is sales . . ."  In other words, being an ADA was, in reality, simply a sales role, and ADAs were expected to know that up front.

52.    In the same presentation, on a list entitled "So, what motivates your team?" the possibilities listed were "telethons, games, application count down charts, legal forms of rewards/prizes, praise, recognition, training, production, what else?"  Nowhere was listed anything about properly informing potential candidates about the school of their choice or admitting students to schools which would best serve their educational and professional goals.

53.    ADA new hire training materials instructed ADAs on their role in the "partnership selling process."  This included "asking for the commitment," handling objections and "confirming the commitment."  This was followed by referral, enrollment, start and confirmation.  Nowhere in the process was any attempt to confirm that the student was prepared to receive an education at the EDMC school, or that the student would be likely to be successful in her studies.

54.    ADAs were instructed to, in calls with potential students, "Build em up," then "Break em Down! Find the Pain!," then "Build em Up!" again, in the hopes of convincing potential students that attending an EDMC school was the key to overcoming the problems in their lives and achieving their life goals.

55.     Moreover, EDMC, with the knowledge and acquiescence of its management and Boards, falsely certified to the Department of Education the results of its compliance and financial audits.

### C. Federal and State Governments Investigate Misconduct at EDMC

56.     On August 3, 2010, the United States Government Accountability Office ("GAO") released a report entitled "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Questionable Marketing Practices" (the "GAO Report").

57.     On August 4, 2010, the United States Senate Committee on Health, Education, Labor and Pensions ("HELP Committee") held a hearing related to its investigation of for-profit education providers.   It was revealed at the hearing that EDMC systematically employed improper practices related to student recruiting, enrollment, admissions, and financial aid.

58.     On July 30, 2012, Senator Tom Harkin, Chairman of the HELP Committee, unveiled a report on the findings of the Committee's two year investigation of the for-profit higher education industry entitled, For-Profit Higher Education: the Failure to Safeguard the Federal Investment and Ensure Student Success (the "HELP Report").

59.     The HELP Report outlines widespread problems throughout the for-profit educational sector, and pinpointed institutional problems at EDMC in its quest to capture federal revenues and profit through enormous growth in enrollment.

60.     As detailed in the GAO Report, HELP Committee hearing testimony and in the 2012 HELP Report, for-profit colleges, including EDMC, systematically used improper and unlawful practices to consistently increase revenues through tuition and fees paid for by federal student aid. The unlawful practices included: misleading prospective students about tuition costs, academic program quality, accreditation, graduation rates, and post-graduation employment prospects and expected salaries; aggressively targeting low-income and vulnerable populations;

14

using aggressive telephone marketing practices; engaging in improper practices in connection

with students' and prospective students' financial aid forms; and improperly compensating

admissions staff based on student enrollments.

### D.  The Qui Tam Actions and State Investigations

61.    On May 3, 2011, a qui tam action captioned *United States of America, and the*

*States of California, Florida, Illinois, Indiana, Massachusetts, Minnesota, Montana, New Jersey,*

*New Mexico, New York and Tennessee, and the District of Columbia, each ex rel., Lynntoya*

*Washington and Michael T. Mahoney v. Education Management Corporation, et. al.* (the

"Government qui tam Action"), filed under the federal False Claims Act in April 2007 in the

United States District Court for the Western District of Pennsylvania, was unsealed as a result of

the Government's intervention in the case.  A copy of the unsealed Complaint in the Government

qui tam Action is attached hereto as Exhibit B and its allegations are incorporated herein.

62.    Five of the states listed on the case caption and the District of Columbia joined

the case based on qui tam actions filed under their respective False Claims Acts.

63.    The Government qui tam Action alleged that the Companies' compensation plans

for admission representatives violated the HEA and U.S. Department of Education regulations

prohibiting an institution participating in Title IV programs from providing any commission,

bonus or other incentive payment based directly or indirectly on success in securing enrollments

to any person or entity engaged in any student recruitment or admissions activity during the

period of July 1, 2003 through June 30, 2011.

64.    The complaint was initially filed by a former admissions representative at The Art

Institute of Pittsburgh Online Division and a former director of training at EDMC Online Higher

Education. The complaint in the Government qui tam Action alleged that the Company and/or

students attending the Company's schools received over $11 billion in funds from participation in Title IV programs and state financial aid programs during the period of alleged wrongdoing.

65.     In March 2012, a qui tam action captioned *United States of America, ex rel. Jason Sobek v. Education Management Corporation, et al.* (the "Sobek qui tam Action" and collectively with the Government qui tam Action, the "Qui tam Actions"), filed under the federal False Claims Act in the Western District of Pennsylvania in January 2010, was also unsealed.  A copy of the unsealed Complaint in the Sobek qui tam Action is attached hereto as Exhibit C and its allegations are incorporated herein.

66.     In the Sobek qui tam Action, it was alleged that EDMC violated the U.S. Department of Education's regulation prohibiting institutions from making substantial misrepresentations to prospective students, did not adequately track student academic progress and violated the U.S Department of Education's prohibition on the payment of incentive compensation to admissions representatives.  The complaint was filed by a former project associate director of admissions at EDMC Online Higher Education who worked for South University.

67.     State and local governments investigated EDMC as well.  For example, in August 2011, EDMC received a subpoena from the Attorney General of the State of New York requesting documents and detailed information relating to the Company's compensation of admissions representatives and recruiting activities.  And in December 2011, the Company received a letter from the City Attorney of the City of San Francisco, California requesting information related to student recruitment and indebtedness, including recruiting practices and job placement reporting, among other issues, by The Art Institute of San Francisco and the seven other Art Institutes located in California.

16

68.     Ultimately, 38 states and the District of Columbia formed a consortium (the "Consumer Protection Consortium") for purposes of conducting investigations into EDMC's potential violations of state consumer protection laws relating to the Company's recruiting activities, job placement efforts and other issues.

69.     The Qui tam Actions alleged that EDMC compensated ADAs, and their supervisors, the Associate Directors of Admissions, based upon the number of new students who enrolled in EDMC institutions, in violation of federal law.

70.     Indeed, the actions alleged that the ADAs' compensation and career advancement within the Company was known as the Admission Performance Plan, explicitly stating that an employee's compensation level was to be determined by the number of new students an ADA recruited.

71.     In addition to compensation, EDMC provided commissions, bonuses, and other incentive payments in the form of awards based solely on success in obtaining student enrollments.

72.     The allegations in the Qui tam Actions were supported by documents demonstrating the scheme.  The Qui tam Actions and the investigations by the Consumer Protection Consortium ultimately resulted in the Debtors reaching settlements with the federal and state government entities pursuant to which the Debtors paid $95.5 million and forgave more than $100 million in student loans owed to Debtors.

73.     These settlements and the substantial monetary harm to the Debtors were the direct result of the wrongdoing of Defendants, which put the Company and the Debtors at risk for enormous liability for continuing violations of federal and state law.

### E.  **Eligibility for Programs under Title IV of the Higher Education Act of 1965**

74.     For-profit universities rely on federal funding in the form of financial aid for their students.

75.     Under Title IV of the HEA, Congress established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") to financially assist eligible students in obtaining a post-secondary education.

76.     Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV programs varies, each Title IV program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

77.      To become eligible to receive Title IV funding under programs such as Pell, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a program participation agreement ("PPA") with the Department of Education.  20 U.S.C. § 1094(a); 34 C.F.R. §668.14.

78.      Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

79.     Section 487 (a)(20) of Title IV, 20 U.S.C. § 1094(a)(20) explicitly requires that schools: "Will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance ...." 20 U.S.C. § 1094(a)(20) (the "Incentive Compensation Ban").

Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban.

80.     In 2002, the Incentive Compensation Regulations accompanying the Incentive Compensation Ban were amended to clarify, among other things, that schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.P.R. § 668.14(b )(22)(ii)(A) ("Regulatory Safe Harbor").

81.     In addition, state authorization and accreditation by an accrediting commission recognized by the Department of Education are also required for an institution to become and remain eligible to participate in Title IV programs. As such, EDMC was also subject to extensive state regulations and requirements of accrediting agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"), Accrediting Commission of Career Schools and Colleges ("ACCSC"), Commission on Colleges of the Southern Association of Colleges and Schools, Higher Learning Commission of the North Central Association, Middle States Association of Colleges & Schools of the Commission on Higher Education, Northwest Commission on Colleges and Universities, and the Commission on Colleges of the Western Association of Schools and Colleges. The requirements of each of the accrediting agencies included, among other requirements, that: "Advertising, recruiting, and admissions information adequately and accurately represented the programs, requirements, and services available to students. An institution may not delegate without supervision these [recruiting] activities to anyone whose economic incentives are to recruit prospects through means that are unethical or

subject to public criticism or to admit ill-prepared applicants.  [r]ecruiting shall be ethical and compatible with the educational objectives of the institution ... The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and accurate information regarding courses and programs, services, tuition, terms, and operating policies." Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure. The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments ... Each school observes ethical practices and procedures in the recruitment of its students. No misrepresentations should be made in student recruitment, including ... b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program."

82.     If the Department of Education or another regulatory agency had determined that an institution improperly disbursed Title IV program funds or violated a provision of the HEA or the implementing regulations, that institution could be required to repay such funds to the Department of Education or the appropriate state agency or lender and could be assessed a substantial fine. Violations of Title IV program requirements could also subject EDMC to other civil and criminal penalties, including the limitation, suspension or termination of the participation of affected institutions in Title IV programs, and, thus, threatening its receipt of federal student aid funds.

### F.  **EDMC's Participation in Title IV Programs**

83.    EDMC signed and submitted PPAs to the Department of Education on behalf of all of EDMC's educational institutions throughout the United States.   In December 2006, EDMC's then Chairman and CEO, McKernan, signed all PPAs for EDMC institutions certifying that EDMC was complying with the Incentive Compensation Ban.

84.    After the original agreements expired, the President for each EDMC institution signed that institution's PPA agreement.  This furthered the conspiracy among Defendants and the individual institutions.

85.    In each PPA, the Company certified that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA ...."

86.    The Company further certified in each PPA that "[i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance ...."

87.    In addition to the certifications made in the PPAs, the Company also made, or caused to be made, additional certifications as part of its annual compliance audits and as part of the student financial aid process.

88.    For example, as a required part of its annual compliance audits, the Company certified that it had complied with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban.

89.    For-profit educational institutions, such as the EDMC Companies, must conduct their compliance audits in accordance with the Department of Education Office of Inspector General's Audit Guide.  The Department of Education uses the results of the compliance and financial audits to determine whether schools are adhering to applicable requirements for Title IV funding, including the Incentive Compensation Ban.  As part of the annual audits, the Company was required to certify, in the form of written "Required Management Assertions,"  that, among other things,  it complied with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban.  Specifically, the Company certified in its "Required Management Assertions" regarding "Institutional Eligibility and Participation" that it has "[n]ot paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention."

90.    In light of the ongoing illegal scheme perpetrated by Defendants, the statements made in each EDMC school's PPA and as part of the annual audit process were fraudulent misrepresentations.  This fraud was ongoing and continued through and beyond the Petition Date, concealing the true nature of Defendants' behavior while assuring Debtors, shareholders, creditors ,the government and students that the EDMC Companies were complying with federal regulations.

91.    The Qui tam Actions alleged that EDMC knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible to receive Title IV funding.  According to the government's allegations, EDMC's statements were false when made, and caused the Department of Education to pay various claims under Title IV programs.

92.     From July 1, 2003 through June 30, 2011, EDMC received more than $11.1 billion in Title IV funding for students enrolled in EDMC institutions.  The Qui tam Actions focused on the alleged violations in connection with EDMC's receipt of these funds.

93.     The Title IV Funding received by EDMC increased rapidly, from $656 million in 2003-2004 to $2.578 billion in 2010-2011.

94.     EDMC continued to receive such funding throughout the time that the litigation was pending in the Qui tam Actions, putting it at further risk of additional liability while the Qui tam Actions ran their course.

### G.  The Qui Tam Allegations

#### EDMC's Alleged Violations of the Incentive Compensation Ban

95.     The Government qui tam Action alleged that EDMC, under the direction of Nelson, McKernan, West, Cowley, Kramer, Novad and other directors and officers, compensated ADAs, including Lynntoya Washington, Relator in the qui tam action, and their supervisors, based upon the number of new students who enrolled in EDMC institutions.  Indeed, ADAs' compensation and advancement in the company were a result of EDMC leadership's relentless and exclusive focus on the number of new students an ADA was able to recruit.  This directly violated the Incentive Compensation Ban.

96.     The Relators in the several qui tam Actions reported and alleged that EDMC created a "boiler room" style sales culture and made recruiting and enrolling new students the sole focus of its compensation system.   Moreover, EDMC's compensation system, and compensation practices, under the supervision of Nelson and other Defendants, resulted in the payment of  "commission[s], bonus[es], or other incentive payment [s]" and thus violated the Incentive Compensation Ban set forth in Title IV of the HEA.  Through its compensation system

and compensation practices, the representations and certifications it made to the federal government in its PPAs, in connection with annual compliance audits, and in other documents, EDMC knowingly violated Title IV of the HEA's Incentive Compensation Ban and Regulatory Safe Harbor, and its accompanying and implementing regulations, all the while certifying that it was complying with those regulations.

<u>EDMC's Compensation System for Admissions Personnel</u>

97.    The Qui tam Actions included extensive allegations regarding the manner in which EDMC's compensation of ADAs, under the supervision of Nelson and others, violated the Incentive Compensation Ban, with citations to specific documents.

98.    Indeed, EDMC's Admissions Department openly admitted that compensation was tied to enrollment numbers.  During Relator Lynntoya Washington's initial interview for her ADA position with EDMC employees Dave Bryant and Gregg Schneider, Mr. Bryant showed Ms. Washington and approximately thirty (30) other candidates a PowerPoint presentation and explained the matrix.  When Ms. Washington then interviewed with EDMC Vice President of Admissions Ken Boutelle in May of 2004, he told her that her compensation would depend on the number of students she enrolled and promised that her compensation would increase within the first six (6) months of employment if she met enrollment goals.

99.    Under Defendants' direction and control, from day one of their employment with EDMC, ADAs were pressured to, and desired to, "go on the Matrix" in order to receive the associated higher levels of compensation, which was directly tied to enrollment, in clear contravention of the Incentive Compensation Ban.

100.    Under the direction and control of Defendants Nelson, McKernan, West, Cowley, Kramer and Novad, EDMC's emphasis of, and reliance on, new student enrollment as the sole basis upon which it determined an ADA's compensation was demonstrated by the

emphasis EDMC placed on training its ADAs to "sell" enrollments.  As the government alleged

based on the statements of the Relators and other EDMC personnel, under the direction and

control of Defendants Nelson, McKernan, West, Cowley, Kramer and Novad:

    a.   In order to boost its student enrollment numbers, EDMC urged ADAs to enroll students before thoroughly reviewing their transcripts to determine their academic qualifications to attend the institution or online program. EDMC also regularly instructed ADAs to enroll applicants regardless of their qualifications, including applicants who were unable to write coherently, applicants who appeared to ADAs to be under the influence of drugs, and applicants for EDMC's online program who did not even own computers.  Although EDMC published academic requirements for incoming students, EDMC accepted any potential student who completed an application and submitted a 150-word essay.  EDMC approved all student applications regardless of the applicant's high school grade point average or the quality of the applicant's written essay, although some deficient students were required to take extra credits.

    b.   EDMC instructed ADAs that, when making a recruitment pitch to a student, the ADA should inform the potential student that EDMC schools have very high career placement percentages and that the Career Services Office would contact the student six (6) weeks prior to graduation and set up interviews for the student with prospective employers.  However, in reality, students themselves had to initiate the process to receive the benefits of the Career Services Office.  In addition, students were only permitted to use the Career Services Office for a limited time after graduation, despite the fact that many ADAs told students that they will have lifetime access to the Career Services Office.

    c.   EDMC instructed ADAs to secure enrollments by employing a recruitment tactic called "finding the pain."   "Finding the pain" meant locating a prospective student's vulnerabilities and exploiting those vulnerabilities to persuade the student to enroll in an EDMC program, even after the student expressed a desire not to enroll.  EDMC trained ADAs that examples of "the pain" include a hypothetical student's desire to earn enough money to move her kids out of a dangerous neighborhood, or her desire to make her father proud.

    101.   Simply stated, under Defendants' direction, the ADAs operated as a "boiler

room" selling potential students on the school, just as a team of salespeople for a corrupt

investment company would push bogus investments.  Each "sale" meant guaranteed federal

student loan money for EDMC, regardless of whether the student had a likelihood of academic

success or ability to pay the loan back.

102.    EDMC's emphasis of, and reliance on, new student enrollment as the sole basis upon which it determined an ADA's compensation was also demonstrated by the way it tracked ADAs' success in evaluating their performance.

103.    For example, as the government alleged in the Qui tam Actions:

a.   Quality factors were not discussed or included in documents EDMC used to track ADAs' performance against their Student Start Plans.  To the contrary, the Student Start Plan, Plan to Make Plan, and associated tracking documents focused entirely on the number of students the ADA enrolled and only measured quantitative factors.

b.   EDMC managers who supervised ADAs used Student Start Plan documents, and other similar documents, as part of each ADA's review every six months, and to provide regular informal feedback to ADAs.  Typically, ADAs were told at the end of their reviews exactly how many student enrollments they needed to procure during the next six-month review period in order to be on track to reach their identified financial goals.  ADAs were not given any similar prodding or incentivizing with respect to any "quality factors."  EDMC presented an ADA's ability to reach her financial goals as solely a matter of procuring an identified number of student enrollments.

c.   In late July or early August of 2006, Relator Michael Mahoney interviewed with Vice President of Admissions for EDMC's Online Higher Education division Ken Boutelle for the position of Director of Training of EDMC's online division.  Mr. Mahoney understood that EDMC's goals were driven by its desire to increase student enrollments at all costs.

d.   As EDMC's Director of Training for EDMC's online division, Mr. Mahoney was charged with revamping EDMC's sales training for ADAs.  When Mr. Mahoney started working at EDMC in October of 2006, EDMC's training materials for its ADAs did not mention Title IV or the HEA's Incentive Compensation Ban.  Mr. Mahoney was never instructed to provide training on the Incentive Compensation Ban.  Consequently, none of the sales training materials Mr. Mahoney created referred to or acknowledged the prohibition regarding incentive-based compensation.

e.   While employed at EDMC, Mr. Mahoney never heard anyone focus on, or even discuss, the "quality factors" reflected on the matrix.  To the contrary, EDMC's focus on ADAs' performance, and therefore their compensation, was limited solely to the number of new student enrollments the ADAs obtained.

104.    The Qui tam Actions alleged that not only did EDMC, under the direction of

26

Defendants, positively reward ADAs based on high numbers of enrollments, it also took adverse actions against those who did not achieve high recruitment numbers, regardless of other aspects of the ADA's performance.

105.    As alleged in the Qui tam Actions, the conduct EDMC engaged in under the direction of Defendants did not fall within the purview of, or satisfy, the Regulatory Safe Harbor.

**H. Defendants Knew or Should Have Known That EDMC's Compensation System Violated the Incentive Compensation Ban and Did Not Qualify for the Regulatory Safe Harbor**

106.    Defendants, and in particular Nelson, McKernan, West, Cowley, Beekhuizen, Kramer and Novad, knew or should have known that the Company's compensation system violated the Incentive Compensation Ban and did not qualify for the Regulatory Safe Harbor.

107.    Consequently, when the Company certified in its PPAs and other documents regarding its compliance with the Incentive Compensation Ban and eligibility for Title IV funding, those certifications were knowingly false. EDMC's compensation system was inconsistent with EDMC's certifications of compliance in its PPAs, compliance audit Management Assertions, and other documents, and it put the Company at risk for billions of dollars in liability.

108.    At the time that the various EDMC Companies certified in their PPAs and yearly audits that they did not make incentive payments to admissions personnel based on their success in securing enrollments, Defendants Nelson, McKernan, West, Cowley, Beekhuizen, Kramer and Novad knew that the Company was paying and planned to continue to pay admissions personnel incentive payments based directly on their success in securing enrollments. This was a continuing course of conduct in furtherance of the conspiracy among Defendants and the EDMC operating entities.

27

109.    Defendants' misconduct led to settlements costing the Company nearly $200 million.

110.    According to a former Vice President of Human Resources, the compensation system for admissions staff was developed at the corporate level and approved by EDMC Corporate. A former Vice President of Admissions reported that the compensation scheme was developed by high level executives and was specifically reviewed and approved by Defendant Nelson.  The EDMC Companies' senior management, including Defendants Nelson, McKernan, West, Cowley, Beekhuizen, Kramer and Novad, played a central role in setting overly aggressive new student enrollment quotas.

111.    The sheer number of abusive and deceptive recruiting and enrollment practices detailed by many current and former employees, located in various geographic locations and business units, easily demonstrated that these were not isolated instances, but rather were a widespread pattern of behavior that was sanctioned by the Defendants.

**J.    The Settlement of the Qui Tam Litigation Devastated the Debtors**

112.    Once the Qui tam Actions and related investigations were revealed, the Company's financial condition precipitously declined.

113.    No later than June 30, 2014, EDMC was insolvent, as liabilities exceeded assets by

almost $300 million.  The Company remained insolvent through the Petition Date.

114.    On August 28, 2015, West resigned as CEO.

115.    On September 1, 2015, Defendant McEachen was named CEO of EDMC and the Delaware Holding Companies.  He remained Chairman of the EDMC Boards.

116.    McEachen would ultimately oversee the Company's prepetition liquidation and he looted the Company by taking almost $14 million for his effort.

117.    In November 2015, Debtors reached a settlement with the U.S. Department of Justice, 12 state attorneys general, the District of Columbia and relators resolving all known cases filed under federal and state False Claims Act (FCA) provisions.  Concurrently, it settled the investigations by the Consumer Protection Consortium (collectively, the "2015 Settlements").  A copy of the Settlement Agreement effectuating the 2015 Settlements is attached as Exhibit D and incorporated herein.

118.    In connection with the 2015 Settlements, EDMC paid $95.5 million, to be distributed among the United States, the various states involved in the litigation, and the Relators.

119.    The 2015 Settlements also resulted in Consent Judgments (the "Consent Judgments") entered in state courts for the states involved in the Consumer Protection Consortium that required certain reforms to the Defendants operations, and, *inter alia*, required the EDMC Companies to forgive $102.8 million in loans to certain students who attended the Company's institutions between January 1, 2006 and December 31, 2014.  As an example of the Consent Judgments, a copy of the Consent Judgment the EDMC Companies entered into with the State of Florida is attached as Exhibit E and incorporated herein.

120.    Prior to entering into the 2015 Settlements and the Consent Judgments, the Company and the Defendants defended the Company's conduct, disputed its liability, and consistently maintained that its business operations complied with federal and state laws and regulations.

121.    It was not until the announcement of the 2015 Settlements in November 2015 that the Defendants' wrongdoing become apparent and that the injury to Debtors became knowable. A copy of the November 16, 2015 press release from the United States Department of Justice announcing the 2015 Settlements is attached as Exhibit F and incorporated herein.

122.    In short, the 2015 Settlements and the revelation of the Company's illegal practices sent the company into a downward spiral from which it never recovered.

123.    In January 2016, Debtors began a "teach-out" (i.e., they accepted no new students) of lower-performing locations.  These included 19 out of the 51 Art Institutes, 22 of the 26 Brown Mackie Colleges and one Argosy College.

124.    The Company spent significant sums to "teach-out" these schools, with the final school teach-outs completed in December 2017.

125.    In June 2016, EDMC announced the closure of most of the Brown-Mackie Colleges.

126.    EDMC engaged an investment advisor to pursue the sale of the school locations that were not being taught-out.  Ultimately, EDMC consummated several transactions as it sold off what remained.

127.    In June 2016, EDMC II LLC sold The Connecting Link II, LLC to Triad Learning Systems, LLC and Taylor Study Method, LLC for $1.7 million.

128.    In January 2017, Debtors sold assets associated with the Brown Mackie College campuses located in Bettendorf, Iowa, Hopkinsville, Kentucky, and North Canton, Ohio to Ross Education, LLC ("Ross Education").  The Debtors' business and assets were in such poor financial shape at the time that Debtors actually had to ***pay*** Ross Education $2.1 million in connection with the sale.

129.    On January 18, 2017, EDMC and certain of its subsidiaries entered into an Asset Purchase Agreement (the "DCF Purchase Agreement") with Dream Center Foundation ("DCF"), a not for profit entity, and certain of its newly formed subsidiaries (collectively with DCF, the "DCF Buyers") for the sale of substantially all of the Company's remaining school locations, specifically South University, Argosy University (including one campus being taught-out), and all of the "core" Art Institutes school locations (other than The Art Institute of Vancouver) which were not being taught-out. The DCF Purchase Agreement was amended and restated on February 24, 2017 and further amended on July 20, 2017 and October 13, 2017. Under the final terms of the DCF Purchase Agreement: (a) There were two closing dates due to a delay in the receipt of regulatory approvals for institutions accredited by The Higher Learning Commission (four locations) and Middle States Commission on Higher Education (two locations including the fully online programs offered by The Art Institute of Pittsburgh), with the first closing occurring on October 17, 2017 and the second closing occurring on January 19, 2018.

130.    In January 2017, pursuant to a Transition Services Agreement executed in connection with the DCF transaction, the DCF Buyers took possession and control of substantially all of the Company's and its affiliates' books and records and agreed to provide certain administrative services to the Company and its affiliates as they wound down business affairs.

131.    Upon information and belief, Defendants' unlawful behavior continued through the sale of the Debtors' businesses.  The unlawful behavior was part of a course of conduct that continued unabated through and beyond the time of the 2015 Settlements.  A review of the Board of Directors' meeting minutes shows no concerted effort by Defendants to reform their behavior or to comply with the Consent Judgments.

132.    At all times material hereto, the Defendants failed to adopt, put in place and/or monitor systems and procedures reasonably necessary to ensure the EDMC Companies' compliance with the federal and state laws applicable to its on-line student programs which accounted for approximately 90% of Company revenues, including Title IV, the Incentive Compensation Ban and the Regulatory Safe Harbor.

## K.  <u>Red Flags Should Have Put Defendants on Notice of the Illegal Scheme</u>

133.    There were numerous so-called "red flags" that should have alerted the Defendants as to the EDMC Companies' illegal recruiting practices and other unlawful conduct, including:

    a.  The Defendants knew or should have known that, by 2010, EDMC was employing a massive team of recruiters, 10 times as many as in 2006, and one for every 28 students.

    b.  The Defendants knew that Nelson had used the same playbook at University of Phoenix, and had violated the same federal laws there, and brought many former University of Phoenix executives with him to EDMC.

    c.  The Defendants knew or should have known that after Nelson joined as CEO, EDMC's enrollment doubled and revenue tripled in just four years, and the number of students in online programs exploded.  Enrollment results and projections were consistently discussed as "key metrics" at Board of Directors' meetings.  Given the federal legal restrictions on recruiting practices and, in particular, the use of federal student loan funds, Defendants had a duty to inquire as to whether and how such growth could have been achieved by legal means, which they disregarded.

    d.  Defendants knew or should have known about the President's Club awards, which were promoted extensively to the ADAs, and awarded the ones who recruited the most students.

    e.  Defendants knew or should have known of the pervasive training materials existent throughout all EDMC brands and schools, which instructed ADAs to act as salespeople and "find the pain" in their attempts to coerce students to attend EDMC schools.

    f.  As early as 2010, Defendants were aware of the findings of the GAO Report and the HELP Committee regarding EDMC's illegal practices.

g.  By April 2011, the Government qui tam Action had been unsealed, and EDMC, though Defendants, continued to deny the allegations of the illegal scheme.

h.  Beginning in 2011, state and local governments began to investigate EDMC and its illegal recruiting scheme.

i.  In July 2012, the Senate HELP Committee published its report on its investigation of for-profit higher education.  It contained specific examples of EDMC's continued use of the illegal recruitment scheme, noting the prizes and compensation that were awarded to ADAs based on the number of students they recruited.  It included a quote from an admissions employee stating "You'd probe to find a weakness, you basically take all that failure and all those bad decisions, and you spin it around and put it right back in their fact as guilt, to go to this sh*tty university and run up all of this debt."  EDMC continued to deny the allegations.

j.  At an August 27, 2013 Board meeting, Defendants Nelson, McKernan, Cowley, West and Beekhuizen, among others, received an update on ongoing legal matters, as well as outstanding issues with accrediting agencies and state licensing boards.  The Company's Chief Compliance Officer presented them with a risk "heat map" setting forth the compliance risks to the company in these areas.

k.  Throughout 2013-2015, Defendants were continually updated on the progress of the Government qui tam Action at Board of Directors' meetings and were made aware of the allegations in the Complaint and the status of the litigation.  Despite this, the Board minutes contain no references to discussions as to how to revise the recruiting practices at EDMC to comply with federal and state law.

l.  It was not until the November 2015 Consent Judgments in the state attorney general investigations that EDMC finally agreed to end "Abusive Recruitment Practices" as defined in those Judgments.  In connection with those Judgments, EDMC agreed to forgive over $102 million in federal student loans it was owed as of September 11, 2015.

m.  In June 2017, as EDMC prepared to sell off its remaining schools to the Dream Center Foundation (DCF), members of Congress again expressed concerns with the continuing pattern and practice of behavior at EDMC.   On June 22, 2017, Senators Dick Durbin, Elizabeth Warren, Sherrod Brown and Kamala Harris, along with Congresswoman Rosa DeLauro of Connecticut, called for close scrutiny of EDMC's proposed sale to DCF.  These members of Congress sent letters to several university accrediting commissions which noted that earlier in 2017, "a staggering number of EDMC programs were revealed to be saddling their students with stunning levels of student debt and producing graduates at poverty-level wages."  It noted that "EDMC had the highest number of programs that failed the guidelines" of the federal gainful employment regulations.  More

than 70% of EDMC schools were failing or in the "warning" zone on these regulations.  Thus, these members of Congress expressed "deep concern" that EDMC was ***still*** maintaining "a predatory operating and recruitment model" in violation of federal law.

n.  These members of Congress were also concerned that EDMC was still engaging in "a pattern of spending more on marketing and recruitment than on instruction, and a financial arrangement that allows institution leaders to personally profit from the institution's operations."

o.  EDMC continued to be the subject of state AG investigations even after the 2015 consent judgments.  In 2018, the Massachusetts attorney general filed a lawsuit against the New England Institute of Art, an EDMC school, alleging that EDMC misled prospective students about the programs offered in order to get them to enroll.

134.    Defendants violated their fiduciary duties by consciously disregarding these red flags and/or through their gross negligence in ignoring and failing to act upon them.


**L.    While the Company Disintegrated, Certain Defendants**
**Looted the Company on their Way Out the Door**

135.    While Debtors were on a death spiral from the damages flowing from the settlements of the Qui tam Actions and related state investigations, certain Defendants lined their pockets and looted the Company of millions of dollars (collectively, the "Excessive Payments to Defendants").

136.    Between January 15, 2016 and February 2, 2018, Debtors made bonus payments to McEachen in the amount of $13,741,064.27 (the "McEachen Payments").  The McEachen Payments are itemized on Exhibit G attached hereto.

137.    Between August 4, 2017 and October 20, 2017, Debtors made bonus payments to Jalufka in the amount of $2,202,295.00 (the "Jalufka Payments").  The Jalufka Payments are itemized on Exhibit H attached hereto.

138.    Between January 15, 2016 and October 20, 2017, Debtors made bonus payments to Kramer in the amount of $2,391,402.00 (the "Kramer Payments").  The Kramer Payments are itemized on Exhibit I attached hereto.

139.    Between August 4, 2017 and October 20, 2017, Debtors made bonus payments to Novad in the amount of $1,443,662.00 (the "Novad Payments").  The Novad Payments are itemized on Exhibit J attached hereto.

140.    On October 20, 2017, Debtors made a bonus payment to Danielson in the amount of $965,000.00 (the "Danielson Payment").

141.    On March 18, 2016, Debtors made a severance payment to Beekhuizen in the amount of $262,000.00 (the "Beekhuizen Payment").

142.    The Debtors were insolvent when the Excessive Payments to Defendants were made.  On June 30, 2016, Debtors had $1,012,222,843 in total assets and $1,292,738,942 in total liabilities, for an excess of liabilities over assets of $280,388,243.  On June 30, 2017, Debtors had $717,217,387 in total assets and $1,184,301,067 in total liabilities, for an excess of liabilities over assets of $467,083,680.   And at the time of the Petition Date, the Company had only $394,635 in assets (excluding net operating loss) and liabilities of $628,885,442.

143.    The Debtors failed to receive reasonably equivalent value in connection with the McEachen Payments, the Jalufka Payments, the Kramer Payments, the Novad Payments, the Danielson Payment and the Beekhuizen Payment, especially in light of said Defendants' participation in the wrongdoing which caused the Debtors' demise.

144.    As a direct and proximate result of the wrongdoing of the Defendants, as aforesaid, the Debtors have suffered damages in an amount which exceeds $220,000,000, and includes the $95.5 million paid in the 2015 Settlements, $102.8 million of student loan debt

35

forgiveness mandated by the 2015 Settlements, the Excessive Payments to Defendants, and the destruction of the Company.

145.     The conduct of the Defendants as aforesaid was intentional, outrageous and sufficiently egregious as to warrant the imposition of punitive damages.

## V.     THE CLAIMS

### FIRST CLAIM – BREACH OF FIDUCIARY DUTIES
#### (Against All Defendants)

146.     Paragraphs 1 through 145 above are incorporated herein by reference, as if restated in their entirety.

147.      As officers and/or directors, Defendants owed fiduciary duties of loyalty and care to the Debtors.

148.     The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves.

149.     The duty of loyalty is breached, *inter alia*: (1) when fiduciaries fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (2) when fiduciaries "abdicate" their responsibilities; and/or (3) when fiduciaries fail to act in good faith.

150.     Delaware law does not charter law breakers.  It permits entities to make a profit, but only when pursuing lawful business by lawful acts.

151.     Fiduciaries of Delaware entities breach their duty of loyalty when they knowingly cause the entity to seek profit by violating the law.

36

152.    Under Delaware law, it is a breach of the duty of loyalty to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.

153.    The duty of care is breached, *inter alia*, (1) when fiduciaries engage in an irrational decision-making process and/or (2) when the conduct of fiduciaries rises to "gross negligence."

154.    To discharge their fiduciary duties, each Defendant was required, *inter alia*: (a) to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of the EDMC Companies, (b) to be and remain informed as to how the EDMC Companies were operating and, upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts, as well as satisfying all the standards of conduct set forth in applicable law, rules and regulations, including, but not limited to, those regulations promulgated by the Department of Education, as well as those established by state agencies and accrediting agencies, and (c) to ensure that the EDMC Companies were operating in a sound manner and in compliance with federal and state laws and guidelines.

155.    By operating the EDMC Companies in an illegal manner and exposing them to substantial liabilities, the Defendants breached the duties of loyalty and care.

156.    By implementing a business model and plan the purpose and effect of which was to fuel growth by engaging in unlawful recruiting methods, the Defendants breached the duties of loyalty and care.

157.    By failing to put in place appropriate internal controls and a proper corporate governance framework to detect and terminate unlawful recruiting and enrollment practices

violative of the Incentive Compensation Ban and other governing federal and state laws and regulations, the Defendants breached the duties of loyalty and care.

158.    Defendants' conduct, which resulted in the 2015 Settlements and the destruction of the EDMC Companies, was not a good faith exercise of prudent business judgment because, among other things, Defendants (a) acted in bad faith, (b) had knowledge of improprieties that they encouraged rather than terminated, (c) engaged in violations of applicable laws and regulations and (d) behaved in a manner that was reckless and egregious.

159.    In other words, the Defendants acted in bad faith by knowingly and willfully allowing violations of law that put the Debtors at risk of hundreds of millions of dollars of liability, which ultimately resulted in the 2015 Settlements, the Consent Judgments and the destruction of the Company.

160.    Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen also failed in their fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company.

161.    Defendants breached the duties of loyalty and care by authorizing and accepting the Excessive Payments to Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen.

162.    As a result of Defendants' breach of fiduciary duties, the Debtors suffered substantial damages for which the Defendants are jointly and severally liable.

## SECOND CLAIM – FRAUD
### (Against All Defendants)

163.    Paragraphs 1 through 162 above are incorporated herein by reference, as if restated in their entirety.

164.    By engaging in the wrongdoing alleged, the Defendants committed fraud and deceit against the Debtors and their creditors.

165.    The Defendants' fraud and deceit included, directing or permitting the Company to engage in illegal recruiting and enrollment practices, and making false and fraudulent misrepresentations to federal and state government authorities, students and prospective students.

166.    As a result of the fraud and deceit of the Defendants, the Debtors suffered substantial damages for which the Defendants are jointly and severally liable.

### THIRD CLAIM – CIVIL CONSPIRACY
**(Against All Defendants)**

167.    Paragraphs 1 through 166 above are incorporated herein by reference, as if restated in their entirety.

168.    The Defendants conspired with each other, and with each operating entity of EDMC – i.e, the individual schools – to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty, fraud, violations of federal law and other wrongs alleged herein.

169.    The Defendants undertook substantial overt acts, as aforesaid, in furtherance of the conspiracies alleged herein and are liable for the damages and harm to the Debtors.

170.    As one or more Defendants left the Company before the Petition Date, each failed to effectively withdraw from the conspiracy because, among other reasons, they failed to blow the whistle and, to the contrary, remained silent as to the wrongdoing in which they and their co-conspirators were engaging, which wrongdoing was merely continued by the remaining co-conspirators.

171.    As a result of the conspiracy among the Defendants, the Debtors suffered substantial damages for which the Defendants are jointly and severally liable.

## FOURTH CLAIM – CORPORATE WASTE
**(Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)**

172.    Paragraphs 1 through 171 above are incorporated herein by reference, as if restated in their entirety.

173.    The Excessive Payments to Defendants constituted corporate waste.  They served no rational business purpose and were commercially unreasonable.

174.    As a result of the waste of the Debtors' property, the responsible Defendants are liable for their respective roles and the damages associated therewith.

## FIFTH CLAIM – UNJUST ENRICHMENT
**(Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)**

175.    Paragraphs 1 through 174 above are incorporated herein by reference, as if restated in their entirety.

176.    The receiving Defendants received benefits without justification as a result of the Excessive Payments to Defendants.

177.    The Defendants have unjustly retained the payments received by each to the detriment of the Debtors and/or their creditors.

178.    As a result of the Defendants' unjust enrichment, the Excessive Payments to Defendants received by each should be returned to the Trustee for the benefit of creditors.

## SIXTH CLAIM – AVOIDANCE OF TRANSFERS
**Pursuant to 11 U.S.C. § 548(a)(1)(A)**
**(Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)**

179.    Paragraphs 1 through 178 above are incorporated herein by reference, as if restated in their entirety.

180.    The Excessive Payments to Defendants (consisting of the McEachen Payments, the Jalufka Payments, the Kramer Payments, the Novad Payments, the Danielson Payment and

the Beekhuizen Payment) were "transfers" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

181.    The Excessive Payments to Defendants were transfers of property, or of an interest in property, of the Debtors to and/or for the benefit of certain Defendants.

182.    The Debtors made the Excessive Payments to Defendants with the knowledge that they would hinder creditors, and thus with the actual intent to hinder, delay and/or defraud the Debtors' creditors.

183.    Accordingly, the Excessive Payments to Defendants constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

<u>**SEVENTH CLAIM – AVOIDANCE OF TRANSFERS**</u>
**Pursuant to 11 U.S.C. § 548(a)(1)(B)**
**(Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)**

184.    Paragraphs 1 through 183 above are incorporated herein by reference, as if restated in their entirety.

185.    The Excessive Payments to Defendants were "transfers" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

186.    At the time of the Excessive Payments to Defendants, Debtors were left with an unreasonably small amount of capital with which to conduct their business, as evidenced by the fact that the Debtors were already in the process of closing down and selling off all schools and winding down operations.

187.    The Excessive Payments to Defendants occurred while the Debtors were insolvent.

188.    The Excessive Payments to Defendants were made to the benefit of insiders, under an employment contract, and were not made in the ordinary course of business, as they

consisted largely of unwarranted bonus payments for engaging in unlawful activity.

189.     In exchange for the Excessive Payments to Defendants, the Debtors received less than a reasonably equivalent value, because they were merely excessive payments to directors and/or officers of a dying company.

190.     Accordingly, the Excessive Payments to Defendants constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

## EIGHTH CLAIM – AVOIDANCE OF TRANSFERS
### Pursuant to 11 U.S.C. § 547(b)
### (Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)

191.     Paragraphs 1 through 190 above are incorporated herein by reference, as if restated in their entirety.

192.     The Excessive Payments to Defendants were transfers of property, or of an interest in property, of Debtors to and/or for the benefit of McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen.

193.     McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen were each insiders of Debtors.

194.     Some of the Excessive Payments to Defendants were made within one year of the Petition Date, as previously set forth.

195.     The Excessive Payments to Defendants were made on account of antecedent debts owed by the Debtors to the recipients of those payments before the transfers were made as set forth in various employee contracts.

196.     The Excessive Payments to Defendants were made while the Debtors were insolvent.

197.     The Excessive Payments to Defendants allowed McEachen, Jalufka, Kramer,

42

Novad, Danielson and Beekhuizen to receive more than they would have received if the payments had not been made and they received payment of those debts to the extent provided by filing a claim in this Chapter 7 proceeding.

198.    Accordingly, the Excessive Payments to Defendants made within one year of the Petition Date constitute avoidable preferential transfers pursuant to Section 547 of the Bankruptcy Code.

### NINTH CLAIM – AVOIDANCE OF TRANSFERS
**Pursuant to 6 Del. C. § 1304(a)(1), and 11 U.S.C. § 544**
**(Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)**

199.    Paragraphs 1 through 198 above are incorporated herein by reference, as if restated in their entirety.

200.    As of the Petition Date, Debtors had numerous general unsecured creditors holding allowable claims who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Excessive Payments to Defendants under 6 Del. Code 1304(a)(1), as set forth on the Debtors' Schedules (*see, e.g.*, EDMC Schedule attached as Exhibit K).

201.    At all times material hereto, Debtors were insolvent.

202.    Debtors made the Excessive Payments to Defendants with the knowledge that they would hinder creditors, and thus with the actual intent to hinder, delay and/or defraud the Debtor's creditors.

203.    Defendants took the Excessive Payments to Defendants knowing that the Debtors were insolvent and heading into bankruptcy.

204.    As Debtors were winding down their operations by closing and/or selling off schools, it was entirely foreseeable and in fact inevitable when the Excessive Payments to Defendants were made that the Defendants would receive a great deal of money leaving the

43

Debtors' creditors high and dry as the Debtors went out of business.

205.     The general unsecured creditors of Debtors were thus foreseeable creditors at the time the Excessive Payments to Defendants were made.

206.     Debtors did not receive reasonably equivalent value in exchange for the transfers constituting the Excessive Payments to Defendants.

207.     The transfers – made when Debtors were insolvent – constituted fraudulent transfers for which the transferee Defendants are liable.

208.     The Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small in relation to the business of the Debtors following the transfers, as set forth above.

209.     The Excessive Payments to Defendants thus constituted fraudulent transfers for which the transferee Defendants are liable.

210.     Accordingly, the Excessive Payments to Defendants constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304 and 1305, and Section 544 of the Bankruptcy Code.

**TENTH CLAIM – RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550**
**(Against Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen)**

211.     Paragraphs 1 through 210 above are incorporated herein by reference, as if restated in their entirety.

212.     The Trustee is entitled to avoid the Excessive Payments to Defendants pursuant to 11 U.S.C. §§ 547, 548 and 544.

213.     The Defendants were the initial transferees of the Excessive Payments to Defendants.

214.     Accordingly, the Trustee is entitled to recover the transfers constituting the

Excessive Payments to Defendants, plus interest, pursuant to Section 550 of the Bankruptcy Code.

## VI.    <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiff, George L. Miller, Chapter 7 Trustee for the jointly administered estates of the Debtors, demands judgment in his favor and against the Defendants, as follows:

(a)    The entry of a judgment in favor of Plaintiff and against the Defendants, jointly and severally, for compensatory damages in an amount in excess of $200,000,000 (which includes $95.5 million paid in the 2015 Settlements, $102.8 million of student loan debt forgiveness, Excessive Payments to Defendants, and damages for the destruction of the Company);

(b)    The entry of judgment for avoidance and recovery of the Excessive Payments to Defendants, entering judgment against each Defendant receiving such payments in the amount of the respective payment, plus interest;

(c)    The entry of judgment in favor of the Trustee and against the Defendants, jointly and severally, for punitive damages;

(d)    Reasonable attorneys' fees and costs; and,

(e)    Such additional relief as this Court deems just.

## VII.    <u>JURY DEMAND</u>

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

DOCS_NY:40652.1 57092/001

Dated: June 17, 2020                    Respectfully submitted,


                                        */s/ Colin R. Robinson*
                                        Bradford J. Sandler (DE Bar No. 4142)
                                        Colin R. Robinson (DE Bar No. 5524)
                                        Pachulski Stang Ziehl & Jones LLP
                                        919 North Market Street, 17th Floor
                                        P.O. Box 8705
                                        Wilmington, DE 19899 (Courier 19801)
                                        Telephone: 302-652-4100
                                        Facsimile:  302-652-4400
                                        E-mail:  bsandler@pszjlaw.com
                                                 crobinson@pszjlaw.com

                                        And

                                        Steven M. Coren (admission *pro hac vice* granted)
                                        Benjamin M. Mather (admission *pro hac vice* granted)
                                        Francis X. Lane (admission *pro hac vice* granted)
                                        Kaufman, Coren & Ress, P.C.
                                        Two Commerce Square, Suite 3900
                                        2001 Market Street
                                        Philadelphia, PA 19103
                                        (21) 735-8700

                                        Counsel for George L. Miller, Chapter 7 Trustee